## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PACIFIC SHORES SUBDIVISION
CALIFORNIA WATER DISTRICT,
et al.,

                         **Plaintiffs,**

               **v.**

UNITED STATES ARMY CORPS OF
ENGINEERS, et al.,

                     **Defendants.**

**Civil Action 04-02091 (HHK)**

### MEMORANDUM OPINION

Plaintiffs bring this action under the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*, and the Administrative Procedures Act, 5 U.S.C. §§ 701 *et seq.*, challenging the issuance of a permit by the United States Army Corps of Engineers[1] to Del Norte County and the California Department of Fish and Game to breach the sand bar separating Lake Earl and Lake Talawa from the Pacific Ocean. Before the court are the parties' cross motions for summary judgment. Upon consideration of the motions, the oppositions thereto, and the administrative record, the court concludes that each motion must be granted in part and denied in part.

---

[1] In addition to the United States Army Corps of Engineers, plaintiffs name Major General Carl A. Strock, in his official capacity as Chief of Engineers and Commander, U.S. Army Corps of Engineers, United States Army, and Pete Geren, in his official capacity as the Secretary of the United States Army, as defendants.

## I. BACKGROUND

**A.      Factual Background**

Lake Earl and Lake Talawa ("Lakes") are two interconnected lakes located several miles north of Crescent City in Del Norte County, California.  The Lakes are separated from the Pacific Ocean by a narrow sand bar and together form a coastal lagoon area that is home to several endangered and threatened species, including the tidewater goby, the Oregon silverspot butterfly, the western snowy plover, the Southern Oregon/Northern California Coast ("SONCC") coho salmon, and the California brown pelican.  For over 200 years, parties seeking to manipulate the level of water in the Lakes and the surrounding wetlands have periodically breached the sand bar separating the Lakes from the Pacific Ocean.  Parties have artificially breached the sand bar (as opposed to a natural breach which occurs when the water level in the Lakes rises to such a height that the sand bar ruptures without any human intervention) for a variety of reasons, including erosion management, flood avoidance, irrigation, and the preservation of existing habitat and wildlife in the Lakes and the surrounding areas.  A disagreement about the best time of year and ideal water height for artificial breaching lies at the crux of this case.

Pursuant to the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and the Rivers and Harbors Act of 1899, 33 U.S.C. § 401 *et seq.*, parties seeking to artificially breach the sand bar must first obtain a permit from the United States Army Corps of Engineers ("Corps").  In 2004, Del Norte County and the California Department of Fish and Game jointly applied to the Corps for a ten-year permit to artificially breach the sand bar when the Lakes are at 8-10 feet above mean sea

2

level[2] ("msl").  As part of the permit process, the Corps is required, under the Endangered

Species Act ("ESA"), to investigate any possible harm that the proposed action might cause to

threatened and endangered species in the Lakes and the surrounding areas.

The ESA requires that the Corps investigate the effects of the proposed breaching action

on listed species through consultations with either the National Marine Fisheries Service

("NMFS") or the United States Fish & Wildlife Service ("FWS").  The FWS administers the

Endangered Species Act with respect to species under the jurisdiction of the Secretary of the

Interior, such as the tidewater goby, the Oregon silverspot butterfly, the California brown pelican

and the western snowy plover, while the NMFS administers the Endangered Species Act with

respect to species under the jurisdiction of the Secretary of Commerce, such as the SONCC coho

salmon.  *See* 50 C.F.R. §§ 17.11, 222.101(a), 223.102, 402.01(b).

The Corps consulted with the NMFS about how the proposed breaching might affect the

SONCC coho salmon and its habitat and with the FWS about how the proposed breaching would

affect the tidewater goby, the western snowy plover, the California brown pelican, the Oregon

silverspot butterfly, and their respective habitats.  The NMFS concluded that "the proposed

action may affect, but is not likely to adversely affect SONCC coho salmon and their critical

habitat."  NMFS Administrative Record ("NMFS AR") 2290.  The FWS concluded that the

proposed breaching "is not likely to jeopardize the continued existence" of any of the listed

species and also that the "proposed action would not result in destruction or adverse modification

of any proposed or designated critical habitat."  FWS Administrative Record ("FWS AR") 192.

---

[2]  "Mean sea level" is the average level of the ocean for all stages of the tide over a period
of 19 years.  If the Lakes are 8-10 msl, it means that the water level in the lakes is between 8 to
10 feet above the msl.

Based on these conclusions, the Corps issued a permit ("2005 permit") to Del Norte County and the California Department of Fish and Game to use a bulldozer to artificially breach the sand bar. Specifically, the ten-year permit permits artificial breaching when the water level of the Lakes reaches 8-10 msl between September 1 and February 15, and again on February 15 if the water level is 5 msl.

Plaintiffs, a Del Norte water management company, and several residents of Del Norte County, bring this suit alleging that the Corps issued the 2005 permit in violation of the ESA.

**B.      Statutory Background**

The Endangered Species Act ("ESA") was enacted in order "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). Once a species is listed as threatened or endangered, it receives substantial federal protection under the ESA. For example, § 9 of the ESA states that "with respect to any endangered species of fish or wildlife . . . it is unlawful for any person . . . to take any such species," where "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1538(a)(1); 16 U.S.C. § 1532(19). The ESA's protection also extends to the species' habitats as the term "harm" has been construed to "include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3.

Federal agencies are subject to the ESA and, under § 7 of the ESA, must "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the

4

continued existence of any endangered species or threatened species or result in the destruction

or adverse modification of habitat of such species." 16 U.S.C. § 1536 (a)(2).  To insure

compliance with the ESA, any time a proposed federal agency action "may affect listed species

or critical habitat," the agency must engage in either informal consultation or the preparation of a

biological assessment.[3]  50 C.F.R. § 402.14(a).  Informal consultation is a "process that includes

all discussions, correspondence, etc., between the Service[4] and the Federal agency . . . designed

to assist the Federal agency in determining whether formal consultation or a conference is

required."  50 C.F.R. § 402.13(a).  If, after either the informal consultation or the preparation of

the biological assessment, the federal agency determines "that the proposed action is not likely to

adversely affect any listed species or critical habitat," then the agency's consultation obligations

under the ESA are terminated.  50 C.F.R. § 402.14(b)(1).  However, if the agency cannot

conclude that the proposed action is "not likely to adversely affect" the listed species, then the

federal agency must proceed to formal consultation.  50 C.F.R. § 402.12(a).

Formal consultation requires the preparation of a biological opinion as to whether the

proposed agency action and its effects are "likely to jeopardize the continued existence of listed

species or result in the destruction or adverse modification of critical habitat."  50 C.F.R. §

402.14(h)(3).  The biological opinion relies on the "best scientific and commercial data

---

[3] "'Biological assessment' refers to the information prepared by or under the direction of the Federal agency concerning listed and proposed species and designated and proposed critical habitat that may be present in the action area and the evaluation [of] potential effects of the action on such species and habitat."  50 C.F.R. § 402.02.

[4] As discussed *supra*, whether the National Marine Fisheries Service or the U.S. Fish and Wildlife Service has jurisdiction depends on the species involved.  The two Services have identical responsibilities under the ESA.

available," to evaluate "the current status of the listed species or critical habitat" and "the effects of the action and [its] cumulative effects on the listed species or critical habitat." 50 C.F.R. §§ 402.14(d), (g)(3), (g)(4). If the Service concludes that the proposed action is not likely to jeopardize or destroy a listed species or adversely modify a critical habitat, then this "no jeopardy biological opinion" must be accompanied by an incidental take[5] statement if any taking may occur as a byproduct of the proposed action. 50 C.F.R. §§ 402.14(g)(7), (i)(1).

The incidental take statement details the impact of the proposed action on the species, identifies the reasonable and prudent measures that are necessary to minimize this impact, and outlines the terms and conditions that must be followed in order to minimize the impact of the action on the species. 50 C.F.R. §§ 402.14(i)(i)-(iv). Provided that the federal agency follows these terms and conditions, any incidental take resulting from the agency action is not considered a violation of § 9 of the ESA. 16 U.S.C. § 1536(o)(2). However, if the incidental take that results from the agency action exceeds the amount of take specified in the incidental take statement, the agency must reinitiate formal consultation. 50 C.F.R. § 402.16(a).

## II. STANDARD OF REVIEW

The appropriate standard of review for an agency action challenged under the ESA is the Administrative Procedures Act's ("APA") "arbitrary and capricious" standard. *Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 686 (D.C. Cir. 1982). Under the APA, a reviewing court shall set aside agency action it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). An agency rule

---

[5] The term "'incidental take' refers to takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant." 50 C.F.R. § 402.02.

is arbitrary and capricious if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  While the court's scope of review is narrow, as it "is not empowered to substitute its judgment for that of the agency," the court must still conduct "a thorough, probing, in-depth review" of the agency's decision.  *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415-16 (1971).

Agency actions are presumed to be valid.  *See Ethyl Corp. v. EPA*, 541 F.2d 1, 31 (D.C. Cir. 1976).  As long as an agency considers relevant factors and can articulate a rational connection between the facts found and the choices made, then its decision will be upheld.  *See State Farm*, 463 U.S. at 43; *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989) (holding that agency action will not be reversed absent a clear error of judgment).  Moreover, when an agency's action relies on scientific and technical information touching upon the agency's area of expertise, a court is particularly deferential.  *See Marsh*, 490 U.S. at 377; *Hüls Am., Inc. v. Browner*, 83 F.3d 445, 452 (D.C. Cir. 1996) ("we will give an extreme degree of deference to the agency when it is evaluating scientific data within its technical expertise.") (internal citations and quotations omitted).

When a final agency action is challenged, the court's review is limited to the administrative record and the grounds for decision invoked by the agency.  *See Camp v. Pitts*, 411 U.S. 138, 142 (1973); *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).  "Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's

administrative decision when review is based upon the administrative record, even though the Court does not employ the standard of review set forth in Rule 56, Fed. R. Civ. P." *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995) (internal citation omitted).

## III.  ANALYSIS

Plaintiffs challenge the Corps' issuance of the 2005 permit on four grounds: 1) the Corps' consultation with the NMFS was arbitrary and capricious; 2) the Corps' consultation with the FWS was arbitrary and capricious; 3) neither the NMFS nor the FWS submitted an appropriate incidental take statement; and 4) the 2005 permit has resulted in the illegal taking of an endangered species.  Defendants rejoin that the Corps, FWS, and NMFS fully complied with the ESA's consultation requirements, submitted appropriate incidental take statements, and that there is no illegal taking of an endangered species.  The court addresses each of plaintiffs' arguments in turn.

## A.      The Corps' Consultation with the NMFS

Plaintiffs contend that the Corps' issuance of the 2005 permit was arbitrary and capricious because it relied on a flawed informal consultation with the NMFS about the effects of the proposed breaching on the coho salmon and its habitat.  Plaintiffs maintain that the consultation with NMFS was flawed for three reasons: 1) the consultation involved a reversal of prior findings; 2) the consultation was not based on sound science; and 3) the consultation failed to consider relevant facts.

### 1. The NMFS Reasonably Modified its Prior Findings

Plaintiffs first argue that the NMFS changed its position with respect to the effects of artificial breaching of the sand bar on the coho salmon.  Plaintiffs contend that the NMFS

8

consistently found from 1999 through 2005 that breaching the sand bar at 8-10 msl was harmful to the coho salmon.  Pls.' Mem. in Supp. of Mot. for Summ. J. ("Pls.' Mem.") 25, 28.  Plaintiffs assert that in the informal consultation at issue, the NMFS unjustifiably changed its position to hold that breaching the sand bar at 8-10 msl had "no effect" on the coho salmon.  *Id.* at 25, 28.  Defendants do not contest that the NMFS's position changed.  Mem. of Law in Supp. of Federal Defs.' Cross-Mot. for Summ. J. and Opp'n to Pls.' Mot for Summ. J. ("Defs.' Mem.") 27.  Defendants maintain, however, hat the NMFS reasonably changed its position after receiving new information, including presence/absence surveys and post-breach surveys indicating that coho salmon were not likely to be in the area at the time of the proposed breaching.  *Id.*

"Agencies are free to change course as their expertise and experience may suggest or require, but when they do so they must provide a 'reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.'"  *Ramaprakash v. F.A.A.*, 346 F.3d 1121, 1124-25 (D.C. Cir. 2003) (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir.1970)); *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 116 (D.D.C. 1995).  "[A]gency action is arbitrary and capricious if it departs from agency precedent without explanation."  *Ramaprakash,* 346 F.3d at 1124.  A court "must accord deference to an agency's reasonable interpretation of its own precedents."  *Global Crossing Telecomm., Inc. v. F.C.C.*, 259 F.3d 740, 746 (D.C. Cir. 2001).

In 1999, the NMFS stated that artificial breaching at the 8-10 msl "could trap coho juveniles in Lake Earl" and that "information has not surfaced to suggest that any coho trapped would survive the summer or later successfully complete their life cycle if they did survive." NMFS AR 779.  These concerns were reiterated in correspondence during 2000 and 2001.  *Id.* at 1229, 1242, 1313.

However, these early concerns were replaced by growing skepticism about whether any coho salmon actually still remained in the Lakes.  Though the Lakes were manually stocked with coho salmon until 1982, the last official observation of the coho salmon in the Lakes was in 1989.  *Id.* at 2290.  The Lakes were known to not be the "habitat of choice or natural abundance" for the coho salmon.  *Id.* at 1901.  And, spot checks of tributaries to Lake Earl found no coho salmon present in 1999, 2001 or 2003.  *Id.* at 787, 1302, 1795.  Moreover, sampling following artificial breaches in 2001, 2002, 2003, and 2004 also found no coho salmon present.  *Id.* at 1332-33, 1629, 1847.  Accordingly, after four years of scientific testing repeatedly failed to demonstrate the presence of any coho salmon in either the Lakes or their tributaries, NMFS concluded in 2004 that the coho salmon and its habitat would not likely be adversely affected by the proposed breaching action.  There is no reason to second guess the NMFS's conclusion.

### 2. *The NMFS Relied on Sound Science*

Plaintiffs next argue that the informal consultation with the NMFS was not based on sound science.  Plaintiffs cite three examples of the NMFS's alleged reliance on flawed science: 1) a statement by the NMFS about the likelihood of natural breaching; 2) a failure to consider the effect of the timing of the artificial breach; and 3) a failure to analyze artificial breaching's effect on the coho salmon's critical habitat.[6]  Defendants argue that the NMFS's conclusions were based on the best available science and that there are no inconsistencies in the Administrative Record.

---

[6]  Plaintiffs also assert that inconsistent statements in the NMFS AR about the presence of coho salmon in the Lakes evidences a reliance on flawed science.  As discussed in Section III(A)(1), the statements plaintiffs cite are not inconsistent as they were made at different times, with the later statements representing a logical modification of the NMFS's position in light of additional information.

To ensure that the ESA is not "implemented haphazardly, on the basis of speculation or surmise," an agency is required "to use the best scientific and commercial data available." *Bennett v. Spear*, 520 U.S. 154, 176 (1997); 16 U.S.C. § 1536(a)(2); *see also Bldg. Indus. Ass'n of Superior California v. Norton*, 247 F.3d 1241, 1246 (D.C. Cir. 2001) (noting that the statute requires use of the "'best scientific . . . data *available*'" and not "the best scientific data *possible*."). Even if that data is imperfect or inconclusive, an agency may rely upon that data and is under "no obligation to conduct independent studies." *Southwest Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000); *see also Bldg. Indus.*, 247 F.3d at 1246. If the agency has engaged in reasoned decision making and there exists a rational basis for the agency's decision, a reviewing court may not upset an agency's decision, even if the court would not have reached a similar result from the same data. *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981).

Plaintiffs first assert that the NMFS's conclusion that natural breaching of the sand bar would occur absent artificial breaching is based on flawed science. Plaintiffs argue that there is no basis for this conclusion because natural breaching does not occur at the Lakes and that all recorded breaches have been man-made. The Administrative Record does not support plaintiffs' arguments. *See, e.g.,* Corps Administrative Record ("Corps AR") 9 ("There are also some accounts of the lake breaching naturally, as it did during the December 1964 flood at 13.5 MSL."); NMFS AR 1451 ("Various historical records . . . suggest that the water surface elevation in Lake Earl and Lake Tolowa between the mid-nineteenth century and the early twentieth century often exceeded 10 to 12 feet, and occasionally reached 14 feet or more, before the natural dynamics at the lagoon mouth resulted in breaching."); FWS AR 244 ("Without human intervention, the Lake would likely rise to twelve or thirteen feet before breaching naturally.").

The NMFS reasonably relied on the Administrative Record in concluding that natural breaching has occurred in the past and would likely occur again if the Lakes were not artificially breached.

Plaintiffs next contend that the NMFS's conclusion that coho salmon would not likely be forced to enter the ocean prematurely did not rely on sound science.  Plaintiffs argue that spring breaching "*would* cause an adverse effect to the species" and that "neither the Corps nor NMFS considered the timing of the breach in making their 'no adverse effect' determinations."  Pls.' Mem 30 (emphasis added).

Plaintiffs misconstrue the NMFS's conclusion.  First, the NMFS found in 2001 and again in 2004 that the spring breaching *might* cause coho salmon to enter the ocean prematurely, not that it definitely would.  NMFS AR 1313 ("breaching during the spring months could affect coho salmon."); *id.* at 2290 ( "[coho salmon] could be forced to enter the ocean prematurely"). Second, the NMFS did not make an absolute "no adverse effect" determination.  The NMFS concluded that the proposed breaching action "may affect, but is not likely to adversely effect" the coho salmon.  *Id.* at 2290.  Additionally, the scientific testing conducted by the NMFS from 2001 through 2004, discussed *supra*, found no coho salmon in the Lakes or their tributaries during the same months that artificial breaching would occur under the proposed 8-10 msl artificial breaching action.  The NMFS reviewed this information and reasonably concluded that since it was unlikely that coho salmon would be present in the Lakes at the time of the artificial breaching, it was also unlikely that coho salmon could be forced to enter the ocean prematurely as a result of the artificial breaching.  *Id.*

Plaintiffs also maintain that the NMFS recognized the existence of the coho salmon's critical habitat[7] in the action area but failed to analyze the effects of the proposed artificial breaching on this critical habitat.  The Administrative Record reveals that the NMFS did analyze the effects of the proposed artificial breaching on the coho salmon's critical habitat.  For example, in the Draft Environmental Impact Report of June 2003, the California Department of Fish and Game ("CDFG") compared habitat conditions and an estimation of habitat benefits for the coho salmon at three different breaching levels: low level (four feet); the proposed breaching level (eight feet) and the estimated natural breaching level (twelve feet).  NMFS AR 1500-02. This assessment also included an analysis of the potential indirect effects of the proposed breaching and an analysis of the effects on tributary streams to the Lakes used by coho salmon. The CDFG concluded that the proposed breaching "is not . . . expected to have significant adverse effects on existing long-term habitat values for sensitive species in the Lake Earl Wildlife Area."  *Id.* at 1503, 1507-08.  Thus, although coho salmon are, under natural conditions, "a minor element in the Lake Earl fish fauna" and neither the Lakes nor their tributaries provide substantial habitat for the coho salmon, a full analysis of the effects of the proposed breaching on the coho habitat was undertaken.  NMFS AR 1880; *id.* at 1880 n.1.  The NMFS reasonably relied on this analysis in concluding that "the proposed action may affect, but is not likely to adversely affect" the coho salmon's critical habitat.  *Id.* at 2290.

---

[7]  "Critical habitat" for a threatened or endangered species refers to:

(i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and (ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.  16 U.S.C. § 1532(5)(A).

### 3.  *The NMFS Considered all Relevant Factors*

Plaintiff's third argument as to the inadequacy of the Corps' informal consultation with the NMFS is that the NMFS failed to consider all the relevant factors before making a final decision.  Pls.' Mem. 30.  Specifically, plaintiffs argue that the NMFS failed to consider the need for salmon to move between the Lakes and the ocean.  Defendants point out how the consideration of this factor was specifically incorporated into NMFS's evaluation of whether coho salmon could be forced to enter the ocean prematurely.  The Administrative Record again supports defendants' position.  The NMFS discussed what would happen if coho salmon were present during the proposed breaching action and reviewed information on the migration patterns of other coho salmon before concluding that it was unlikely that coho salmon would be present in Lake Earl during the timing of the proposed breaching.  NMFS AR 1489-90, 1500-03, 1880, 2290; *see also* Section III(A)(2).

## B.    **The Corps' Consultation with the FWS**

Plaintiffs also contend that the Corps' issuance of the 2005 permit was arbitrary and capricious because it relied on a flawed formal consultation with the FWS about the effect of the proposed breaching on the tidewater goby, the western snowy plover, the California brown pelican, and the Oregon silverspot butterfly.  Plaintiffs contend that the consultation with the FWS was flawed for three reasons: 1) the consultation involved a reversal of prior findings; 2) the consultation used an improper environmental baseline; and 3) the consultation did not rely on sound science.

### 1.  The FWS Reasonably Modified its Previous Position

Plaintiffs maintain that the FWS unreasonably reversed its prior position when the FWS concluded in its 2005 biological opinion "that water quality would be improved from higher water levels," after a 2000 NMFS study reached precisely the opposite result.  Pls.' Mem. 33. Defendants rejoin that the 2005 biological opinion and the 2000 NMFS study analyzed the relationship between water quality and water levels for two different fish: the tidewater goby and the coho salmon.

The tidewater goby and the coho salmon prefer different habitats.  In its 2005 biological opinion, the FWS concluded that higher lagoon water levels during the summer months improve water quality and provides additional habitat for the tidewater goby.  FWS AR 188.  The higher water levels create a larger lagoon perimeter and preserve shallow marsh areas that create better water quality for the tidewater goby.  *Id.* at 185-86, 188.  In 2000, the NMFS found that lower water levels provide better water quality for the coho salmon.  NMFS AR 1244.  Lower water levels in the Lakes creates higher water flows and colder temperatures that result in better water quality for the coho salmon.  NMFS AR 1244.  Plaintiffs are incorrect in arguing that these two statements are in conflict with one another.

### 2.  The FWS Used the Proper Environmental Baseline

Plaintiffs argue that the FWS failed to utilize the proper environmental baseline because the FWS assumed that the Lakes would naturally breach at 12-14 msl.  Plaintiffs contend that the Lakes have not naturally breached at this level in over one hundred years.  Thus, plaintiffs argue, the inclusion of this assumption regarding natural breaching renders the biological opinion invalid.  Defendants rejoin that the FWS's assumption about natural breaching is supported by the Administrative Record and that the FWS used the proper environmental baseline.

A formal consultation must include an evaluation of the effects of the proposed action. 50 C.F.R. § 402.14(g)(3).  The effects refers to "the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline." 50 C.F.R. § 402.02.  The environmental baseline "includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area."  50 C.F.R. § 402.02.  The FWS is required to account for the impact of other agency or private past and present actions when determining the appropriate environmental baseline for the proposed action under review.  This baseline is then used as a reference in assessing the net impact on the listed species and its habitat that will result from the proposed agency action.  *Defenders of Wildlife v. Norton*, No. Civ. A. 99-9217, 2003 WL 24122459,  at *3-4 (Jan. 7, 2003).

As discussed *supra*, the statement that, if not for artificial breaching, the Lakes would likely naturally breach at 12-14 msl is supported by the Administrative Record.  *See* Section III(A)(2).  Though artificial breaching has long been the preferred method for managing the level of water in the Lakes, consideration of natural breaching levels – what would happen absent the artificial breaching – is an appropriate factor in the FWS's biological opinion.  The FWS did not include this assumption about natural breaching to the exclusion of a consideration of the effects of past private actions such as artificial breaching.  The FWS noted that artificial breaching "apparently occurred as early as 1873" and continuously since at least 1977.  FWS AR 185.  The FWS explained that artificial breaching "has encouraged human development in the flood plain" and, more specifically, has led to the creation of a largely undeveloped subdivision of 1400 lots. *Id.*  Additionally, for each potentially affected species, the FWS considered the direct and indirect effects of the proposed breaching in light of the past artificial breaches.  *Id.* at 187-191. Plaintiffs' concerns about the FWS's use of an improper environmental baseline are unwarranted.

### 3. *The FWS Relied on Sound Science*

Plaintiffs next argue that the FWS's biological opinion did not rely on sound science. Plaintiffs provide three examples of the FWS's purported reliance on flawed science: 1) making unsupported assumptions about the tidewater goby's habitat; 2) neglecting to consider the effect of stranding on the goby; and 3) failing to consider data showing that higher breach levels lead to flooding, *E. coli* contamination, and DDT in the Lakes. Pls.' Mem. 33-34. Defendants assert that "the Service did properly consider all of the potential impacts upon the tidewater goby," and that plaintiffs' concerns about *E. coli* and DDT are beyond the scope of the FWS's inquiry. Defs.' Mem. 13, 15-16.

Plaintiffs first state that the FWS has no data to prove that the larger lake area created by higher water levels results in significantly more habitat for the tidewater goby. To the contrary, there is significant data in the Administrative Record to conclude that higher water levels result in more habitat for the goby. A 2000 study relied upon by the FWS includes specific data correlating the relationship between the water level in the Lakes and the total surface area of the Lakes. FWS AR 185-86, 1863. The study also explains how more of the tidewater goby's primary habitat in the shallow littoral zones becomes available at higher water levels and concluded that "[t]he higher the water surface elevation in the lagoon the more habitat available for the tidewater goby." FWS AR 1887-1899, 1899. This conclusion is echoed by a 2003 report noting that the greatest acreage of vegetated habitat (which the goby needs for spawning and rearing purposes) for the tidewater goby does not appear until lagoon elevations reach 6-7 msl. FWS AR 544, 573.

Plaintiffs next argue that the FWS failed to consider that breaching at 8 msl creates more isolated pools of water and strands more gobies than breaching at a lower level.  Plaintiffs incorrectly assume that the FWS is required to engage in a comparison of different breaching alternatives.  The FWS's sole obligation under the ESA is to consult on the prospective agency action which, in this case, is the proposed artificial breaching at 8-10 msl.  16 U.S.C. § 1536(a)(2) ("The Federal agency shall . . . insure that any action authorized, funded, or carried out *by such agency* . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat") (emphasis added); 16 U.S.C. § 1536(a)(3) ("a Federal agency shall consult with the Secretary on *any prospective agency action*") (emphasis added).  The Administrative Record indicates that the FWS did consider the isolated pools and stranded gobies that would result from breaching at 8-10 msl.  FWS AR 189-90, 1898-1900.  The FWS concluded that the level of harm to the goby from breaching at 8-10 msl was not likely to jeopardize the continued existence of the species.  FWS AR 192.  The FWS also provided an incidental take statement acknowledging the stranding of some gobies at 8-10 msl.  FWS AR 192-93.  Thus, the FWS did properly consider the potential impact of stranding of the tidewater goby that might occur at the proposed artificial breaching of 8-10 msl.

Plaintiffs also argue that the FWS ignored data showing that higher breach levels, such as 8-10 msl, caused the flooding of nearby Fort Dick Dump "which could result in DDT in the Lakes and the flooding of wells which leads to *E. coli* contamination."  Pls.' Mem. 34.  Defendants respond that there is no evidence that DDT or other contaminants are present in the Fort Dick Dump.  Defs.' Mem. 15.  Defendants are correct.

Plaintiffs assert that the following statement made by Dr. Richard Mize, the Del Norte County Public Health Officer, after the Lakes flooded in 1992 support their contention regarding the presence of DDT and other contaminants in the Lakes:

> [T]he County identified an abandoned dump site off Kellogg road which was inundated.  They stated that the dump has 'hydraulic continuity' with water on the surrounding pastures and residential land.  The dump predates the banning of DDT [dichlorodiphenyltrichloroethane], other pesticides and PCB's [polychlorinated biphenyls].  Therefore the county requested an immediate permit for a breach to prevent further contamination of ground water.

Corps AR 944 (internal quotations omitted).  Plaintiffs have drawn an unsupported conclusion. Dr. Mize's statement does not establish that the Fort Dick dump site contains DDT, only that the dump site was built before DDT became a banned substance.

Plaintiffs next point to a statement following an analysis of well water in the areas immediately surrounding Lake Earl as evidence of the FWS's reliance on flawed science.  After flooding in March 2003, water from the Lakes flooded several nearby residential water wells. Testing on eight of the flooded wells revealed *E. coli* contamination in two wells and coliform contamination in five wells.  Corps AR 987.  The report on the testing observed that "[w]hile the exact cause of the contamination is not yet known, experts at Sierra Environmental Monitoring, Inc. (Reno, Nevada), indicated that contamination of the private well systems could easily have occurred from the nearby Lake Earl, which is known to contain coliform."  Corps AR 987. Plaintiffs have again drawn an unsupported conclusion.  Testing on the flooded wells did not prove that the *E. coli* bacteria was present in the Lakes nor establish that the Lakes were the source of the coliform contamination.

Furthermore, in September 2003, the Regional Water Quality Control Board wrote that "no evidence exists to indicate that lagoon surface elevations up to 10 feet would result in onsite septic system failures, domestic well contamination, or leaching from the Fort Dick burn dump site." Corps AR 567. The California Department of Fish & Game concurred with this conclusion. *Id.* Absent any evidence of well contamination or DDT leaching from the Fort Dick dump, the FWS was under no obligation to consider these factors in its formal consultation with the Corps.

**C.      The Incidental Take Statements Prepared by the FWS and the NMFS**

Plaintiffs argue that the Corps' consultation with the NMFS was arbitrary and capricious because the NMFS did not provide an incidental take statement. Plaintiffs argue that the Corps's consultation with the FWS was arbitrary and capricious because the FWS neglected to provide an incidental take statement for several species and submitted an incidental take statement that lacked a required element. The court concludes that the NMFS did not need to provide an incidental take statement and that the FWS did not need to provide an incidental take statement for the western snowy plover and the Oregon silverspot butterfly. However, the court finds that the FWS's incidental take statement lacked a required element and that the FWS was required to include the California brown pelican in its incidental take statement.

*1. The NMFS Did Not Need to Provide an Incidental Take Statement*

Plaintiffs maintain that the NMFS was required to provide an incidental take statement because "'the proposed action may affect' coho salmon." *Id.* at 35 (quoting NMFS AR 2290). Defendants deny that an incidental take statement was required. Defs.' Mem. 24 n.7. Defendants are correct.

Informal consultation is "an optional process" designed to help the federal agency determine whether formal consultation is required.  50 C.F.R. § 402.13(a).  In the informal consultation process, once an agency determines "that the [proposed] action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and *no further action* is necessary."  50 C.F.R. § 402.13(a) (emphasis added).  An incidental take statement is only necessary when the agency proceeds to the formal consultation process.  *See* 50 C.F.R. § 402.14(i) (discussing, exclusively in the context of a formal consultation, the requirement to provide an incidental take statement).

The Corps initiated informal consultation with the NMFS "for impacts to critical habitat for the federally listed coho salmon" in November 2004.  NMFS AR 2279.  The Corps sought the NMFS's written concurrence with the Corps' conclusion that the proposed action "may affect, but is not likely to adversely affect critical habitat for coho salmon."[8]  *Id.*  The NMFS concurred that the proposed breaching was not likely to adversely affect either the coho salmon or the salmon's critical habitat.  *Id.* at 2290.  The informal consultation process was thereby terminated.  *See* 50 C.F.R. § 402.13(a).  The Corps fully complied with the requirements for an informal consultation and no further action, including an incidental take statement, was necessary.

### 2.  The FWS's Failure to Provide a Legally Sufficient Incidental Take Statement

Plaintiffs maintain that the FWS's incidental take statement was defective for three reasons: 1) it failed to provide a specific number for the anticipated take of the tidewater goby; 2)

---

[8]  The Corps only consulted about the proposed breaching's effect on the coho salmon's habitat and not on the coho salmon itself.  The Corps decided that there was no need to consult on the coho salmon because the most current post-breach survey found no coho salmon in the Lakes.  NMFS AR 2279.  The NMFS disagreed with the Corps' conclusion that there were no coho salmon present in the Lakes, and so the NMFS considered both the coho salmon and the salmon's critical habitat in the informal consultation.  *Id.* at 2290.

it failed to include a required term and condition for minimizing the take of the tidewater goby; and 3) it failed to address the take of the western snowy plover, the Oregon silverspot butterfly, and the California brown pelican.  Pls.' Mem. 36-37.  Defendants maintain that the FWS's incidental take statement was fully consistent with the ESA.

### i.  Calculating Take of the Tidewater Goby

Plaintiffs argue that the FWS's incidental take statement was flawed because it failed to include specific numbers or measurable effects in estimating the effect of the proposed breach on the tidewater goby.  Plaintiffs assert that the incidental take statement only assesses the injury or mortality to the tidewater goby with the vague phrase "[a]n undetermined number of gobies would be entrained during each breach."  *Id.* (quoting FWS 192).  Plaintiffs fail to acknowledge the FWS's appropriate use of an ecological surrogate.

An incidental take statement must specify the amount or extent of the incidental taking of the listed species that will occur as a result of the proposed agency action.  50 C.F.R. § 402.12(i)(1)(i).  While an incidental take statement should ideally identify the amount or extent of taking of the subject species with a specific number, neither Congressional intent nor case law require a precise numerical limit.  H.R. Rep. No. 97-567, at 27 (1982) ("The Committee does not intend that the Secretary will, in every instance, interpret the word 'impact' to be a precise number. . . . [t]he Committee recognizes . . . that it may not be possible for the Secretary to specify a number in every instance."); *Ariz. Cattle Growers' Ass'n v. U.S. Fish and Wildlife, Bureau of Land Mgmt,* 273 F.3d 1229, 1249-50 (9th Cir. 2001) (providing examples of incidental take statements that were held valid despite lacking a specific numerical limit).

When the NMFS cannot provide a specific number for the level of acceptable take, the

NMFS may use "ecological conditions as a surrogate for defining the amount or extent of

incidental take . . . so long as these conditions are linked to the take of the protected species."

*Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1250 (internal citation omitted).   An appropriate

ecological condition surrogate is one where changes in those ecological conditions are directly

linked to changes in the take of the subject species.   *Id.*  Provided that the changes in the

ecological conditions can be expressed in quantifiable terms, these conditions may be used as a

surrogate for measuring the impact of the proposed action on the affected species in the incidental

take statement.   *Id.*  Any incidental take that results from the agency action but that does not

surpass the threshold established by the ecological condition surrogate is considered a permissible

taking under the ESA.   *Id.;*16 U.S.C. § 1536(o)(2).

The FWS's incidental take statement for the tidewater goby includes the vague phrase

cited by plaintiffs but *also* includes a second, more precise measure of the anticipated incidental

take of the tidewater goby.[9]  This second measure uses an ecological surrogate, harm to the

tidewater goby's habitat, to define the anticipated take of the tidewater goby.   The FWS explains

why the incidental take of the goby would be difficult to quantify with a specific number.   FWS

AR 192.   According to the FWS, the lack of access to accurate baseline information about the

current numbers and habitat of the goby and the obstacles associated with locating and measuring

the number of dead or injured gobies that would result from the proposed breaching action make

---

[9]  It is unclear how plaintiffs determined that the incidental take statement only measured the incidental take in terms of injury and mortality, Pls.' Mem. 36, when the immediately preceding paragraph measured the incidental take in terms of the harm the proposed breach might cause to the goby's habitat.  The sentence introducing both paragraphs reads: "The incidental take statement is expected to be in the following forms."  FWS AR 192 (pluralization in original).

the use of a precise number difficult.  FWS AR 192.  Thus, the FWS proceeds to define the level

of incidental take of the goby through the use of an ecological condition surrogate: harm to

suitable tidewater goby habitat.  The FWS states:

> Approximately 2,500 acres of suitable habitat would be unavailable to tidewater
> gobies after each breach event as the water's edge recedes, exposing sheltering,
> spawning, rearing, and foraging habitat.  The number of acres of suitable habitat
> affected depends on lagoon water levels at the time of breaching.  We anticipate
> up to three breaches annually, depending on rainfall and ocean sand transport.
> Therefore, up to 7,500 acres of suitable tidewater goby habitat may be affected
> annually, or up to 75,000 acres over the life of the 10-year permit.

*Id.*  In connecting the taking of the tidewater goby to the effect of the proposed breach on the areas

the goby inhabits, the FWS has provided the required "articulated, rational connection" between

the ecological condition surrogate and the anticipated incidental taking of the subject species.

*Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1250.  Through the use of this ecological condition

surrogate, the FWS has appropriately provided a quantifiable and measurable threshold of

acceptable take for the tidewater goby.

**ii.  Terms and Conditions**

Plaintiffs next argue that the FWS's incidental take statement failed to include, as

required,  a term and condition necessary to minimize the proposed breach's effect on the

tidewater goby.[10]  Defendants do not contest plaintiffs' assertion but maintain that the absence of a

term and condition simply provides the action agency with discretion on how to minimize the

take.  Even if the absence of a term and condition is determined to be a violation of the ESA,

defendants continue, the violation is harmless.  Defendants are wrong.  The plain language of the

---

[10]  An incidental take statement is required to include terms and conditions to help
minimize the take of the listed species. 16 U.S.C. § 1536(b)(4).

ESA supports neither defendants' interpretation of the absence of a term and condition nor their proposed remedy for this omission.

The ESA mandates that "the Secretary *shall* provide the Federal agency . . . with a written statement that sets forth the terms and conditions . . . that *must* be complied with by the Federal agency" in order to implement "those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize [the] impact" of the proposed action.  16 U.S.C. § 1536(b)(4) (emphasis added).  This written statement, the incidental take statement, must identify reasonable and prudent measures to help minimize the taking of the species and also must set forth the terms and conditions that the applicant agency needs to comply with in order to ensure that these measures are being implemented.  50 C.F.R. §§ 402.14(i), (ii), (iv).  The language of the incidental take statement itself is also non-discretionary.  FWS AR 193 ("The measures described below are non-discretionary, and must be undertaken by the Corps so that they become binding conditions").  This statutory and regulatory language obligates the Corps to minimize the impact of the proposed action and also acts as a trigger for the reinitiation of formal consultation.  *See* 50 C.F.R. §§ 402.14(i), 402.16(a).

The FWS identified three reasonable and prudent measures as "necessary and appropriate to minimize take of the tidewater goby" but only supplied the Corps with terms and conditions for two of those measures.  FWS AR 193.  Thus, while minimizing changes in water quality is deemed a necessary and appropriate measure, the FWS does not supply a term and condition governing implementation of this measure.  *Id.*  Contrary to defendants' argument, there is no discretionary language in § 1536(b)(4) or in the incidental take statement.  In failing to include a required term and condition, the FWS has ignored the plain language of the ESA and also

25

removed the Secretary's ability to revoke a permit for noncompliance.  16 U.S.C. § 1539(a)(2)(C) ("The Secretary shall revoke a permit issued under this paragraph if he finds that the permittee is not complying with the terms and conditions of the permit.").  Thus, the FWS submitted an inadequate incidental take statement.

Defendants argue that omission of a required term and condition requires only that the FWS articulate to the Corps how that reasonable and prudent measure should be implemented.  Defs.'s Mem. 22.  Defendants cite no authority for this assertion.  An incidental take statement that fails to include terms and conditions governing the implementation of reasonable and prudent measures is "arbitrary and capricious."  *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 422 F. Supp. 2d 1115, 1141 (N.D. Cal. 2006) (holding that the failure to include terms and conditions to minimize the potential for incidental take is arbitrary and capricious even though the subject species was uncommon in the affected area).  The Corps' reliance on the FWS's legally inadequate incidental take statement was arbitrary and capricious.  5 U.S.C. § 706(2)(A).

### iii. Incidental Take Statements for the Western Snowy Plover, the Oregon Silverspot Butterfly, and the California Brown Pelican

Plaintiffs lastly assert that FWS's incidental take statement is flawed because it failed to address the take of the western snowy plover, the Oregon silverspot butterfly, and the California brown pelican.  Defendants argue that the incidental take of these species was not addressed because the proposed breaching action would not result in the take of any of these species.

Plaintiffs cite to the FWS's biological opinion concluding that "[t]he proposed action will displace wintering western snowy plovers" and noting that "snowy plovers have been killed and injured by vehicle use within their habitat" to demonstrate the need for an incidental take

statement for the western snowy plover.  Pls.' Mem. 37 (*citing* FWS AR 188).  Plaintiffs also point to the FWS's plans to "survey and quantify the number and species of water birds found dead along the beach as a result of the breach" as evidence that "dead birds are likely to be found."  Pls.' Mem. 37 (*citing* FWS AR 180).  Defendants respond that no take of the western snowy plover will result from the breaching action as the western snowy plover is not found in the breaching area during the times when the breaching will occur.  The court is unpersuaded by the plaintiffs' selective employment of phrases divorced from their context.

An incidental take statement is only required when the taking of an endangered species may occur *as a result* of the agency action.  16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.02 (defining incidental take as take that results from the activity conducted by the applicant); *see also City of Tacoma, Washington v F.E.R.C.*, 460 F.3d 53, 75 (D.C. Cir. 2006) (stating that an incidental take statement is required for "any incidental taking of a listed species that *will result* from the action") (emphasis added).  An incidental take statement is not required when the proposed agency action would not be the cause of the taking.  *Babbitt v. Sweet Home Chapter of Communities for a Great Or.*, 515 U.S. 687, 700 n.13 ("but for" causation is "obviously require[d]" to make out a takings claim); *Forest Conservation Council v. Rosboro Lumber Co.,* 50 F.3d 781, 787 (9th Cir. 2005) (holding that plaintiff failed to make out a takings claim due to "the lack of a causal connection between the challenged action and the alleged injury to the protected species"); *Alabama v. U.S. Army Corps of Engineers*, 441 F. Supp. 2d 1123, 1132 (N.D. Ala. 2006) (discussing the need to establish "but for" causation between the challenged agency action and subsequent take in order to make out a takings claim).

Plaintiffs are correct that the proposed breaching action will temporarily displace the low numbers of plovers in the breaching area; however, this displacement will be of short duration, with minimal disturbance to the plovers' habitat, and is unlikely to "to result in long-term or permanent alteration of [the plovers'] behavior." FWS AR 188. There is ample habitat for the plovers to relocate to during the temporary displacement. *Id.* at 186, 188. Plovers that have been observed in the area have shown no signs of adverse effects as a result of recent breach attempts, even returning as soon as the day following the breach. *Id.* Additionally, even though snowy plovers have apparently not nested or bred in the area in recent times, the proposed breaching timetable makes it very unlikely that plover nests or broods will be in the affected area at the time of the artificial breaching. *Id.* at 186, 189; *id.* at 2989 ("the near absence of plovers during the breeding season at locations in Del Norte County"); *id.* at 2993 (documenting that zero snowy plovers were observed breeding in Del Norte County in 2004).

With respect to plovers struck by vehicles, the FWS noted that several western snowy plovers have been killed within their habitat. The FWS cited two examples from the past seven years, both of which occurred at night, and neither of which occurred at the breach site. The FWS's solution – that "all breach-related activities should occur during daylight" – addresses the cause of the identified plover fatalities that might result from artificial breaching. FWS AR 188. The FWS is not required to issue an incidental take statement for plover fatalities caused by the use of recreational vehicles, dogs, nighttime beach parties, or the general public's other actions in the area. *See* FWS AR 3000-01 (discussing sources of plover fatalities in Northern California). Additionally, the proposed breaching will occur well before the plovers' breeding season and adult plovers are "readily capable of running or flying away." Corps AR 1141.

Thus, the net effect of the proposed breaching on the western snowy plovers present (if any) in the breaching area is a temporary displacement.  There is no "destruction or adverse modification of any proposed or designated critical habitat."  FWS AR 192.   The temporary displacement of the western snowy plover that may result from the proposed breaching action does not constitute a taking under the ESA and the FWS was not required to issue an incidental take statement for the western snowy plover.

Plaintiffs also challenge the FWS's omission of an incidental take statement for the Oregon silverspot butterfly.  Plaintiffs argue that take would result from the flooding of the butterfly's habitat.  Defendants do not contest plaintiff's allegations that flooding of the butterfly's habitat and the drowning of butterfly eggs and larvae will occur if the Lakes are artificially breached at 8-10 msl.  However, defendants contend that because flooding of the habitat is a natural event, and would occur even in the absence of federal action, no incidental take statement is required.

Defendants' argument is well-taken.  There is no cause and effect relationship between the proposed breaching and the flooding of the butterfly's habitat.  Plaintiffs are correct that flooding of the butterfly's habitat will occur once the water level in the lagoons rises to a certain level.[11]  However, plaintiffs fail to distinguish between take that occurs as a result of agency action and take that occurs subsequent to agency action but is not caused by that agency action.  Merely

---

[11]   The Oregon silverspot butterfly lays its eggs in grass debris in the late summer in moist, lowland areas.  FWS AR 1823.  The eggs hatch and the resulting larvae hibernate in the surface-level debris until the following spring.  FWS AR 1823.  The larvae emerges when the blue violets – the butterfly's primary foodplant – begin to grow in the moist soil in late April and May.  However, when the water level in the Lakes exceeds 9 msl before late April, most of the silverspot butterfly's habitat is flooded and the hibernating larvae are drowned.  FWS AR 1844.

because one follows the other in time does not establish the required causal connection.  Plaintiffs fail to establish that the proposed agency action is the cause of the take.  The natural filling of the lagoons and the accompanying flooding of the adjacent region occurs as a result of natural conditions and not as a result of the artificial breaching.  The FWS is not obligated to issue an incidental take statement for the effects of flooding of the butterfly's habitat when that flooding is completely unconnected to the proposed breaching action.

Plaintiffs also contend that the FWS needed to include an incidental take statement for the brown pelican.  Defendants argue that no incidental take statement was necessary for the brown pelican due to the low likelihood that a take would occur.

During the formal consultation process, the FWS is required to include an incidental take statement with the no jeopardy biological opinion "if such take *may* occur."  50 C.F.R. § 402.14(g)(7) (emphasis added).  Here, the FWS established that brown pelicans are present in the affected area and admitted that the brown pelicans face a greater risk of take as a result of the artificial breaching.  FWS AR 510 (stating that 91 brown pelicans were observed in the Lakes area in October 2004); *id.* at 184; *id.* at 189 ("the risk to brown pelicans is increased, [though] minimally" by the artificial breaching).  Yet the FWS failed to issue an incidental take statement for the brown pelican, an omission that defendants argue was legitimate because of the low probability of take.  This is a flawed interpretation of the FWS's statutory obligation.  The term "may" is broadly interpreted under ESA regulations and the FWS's obligation to issue an incidental take statement was triggered by the possibility of take of the brown pelican, regardless of how unlikely that possibility may have seemed.  51 Fed. Reg. 19926, 19949 (June 3, 1986) (endorsing the definition of "may affect" for purposes of 50 C.F.R. § 402.14(a) as "[a]ny possible

effect, whether beneficial, benign, adverse, or of an undetermined character."). Accordingly, the FWS's biological opinion is arbitrary and capricious because it fails to consider incidental take of the brown pelican. *See State Farm*, 463 U.S. at 43.

**D.      Violations of § 9 of the ESA**

Plaintiffs contend that the Corps is illegally taking endangered species in violation of § 9 of the ESA.  More specifically, plaintiffs allege that the Corps' failure to issue a permit at 4-6 msl resulted in death or injury of the tidewater goby, the Oregon silverspot butterfly, the western snowy plover, the coho salmon, and the California brown pelican.  Pls.' Mem. 41.  Plaintiffs also maintain that artificially breaching the Lakes at 8-10 msl is resulting in illegal take of these species.  Defendants assert that the ESA does not provide plaintiffs with a vehicle to challenge the 2005 permit on the grounds that a different breaching option would cause less take.  Defendants also maintain that the Corps is not responsible for take caused by natural events.  Defs.' Mem. 11.

Defendants correctly assert that the plaintiffs misconstrue the nature of the Corps' obligations.  As discussed *supra*, the Corps' responsibility is to determine whether the proposed artificial breaching action at 8-10 msl complies with the ESA.  *See* Section III(B)(3).  Plaintiffs' attempts to challenge this permit on the grounds that a lower breaching level would result in less take are misguided.  The ESA does not hold the Corps accountable for an inaction, i.e., the failure to breach at 4-6 msl.  *See* 50 C.F.R. § 402.03 (stating that § 7 of the ESA only applies to "actions in which there is discretionary Federal involvement or control.").  The Corps is charged only with evaluating and ensuring that the proposed action – artificial breaching at 8-10 msl – complies with the ESA.  Here, the Corps has engaged in the required consultations and has appropriately concluded that the 8-10 msl permit complies with the ESA.  The Corps' responsibilities under the ESA do not extend further.

Plaintiffs' assertions that artificial breaching at 8-10 msl would cause illegal take are similarly misguided.  Under § 9 of the ESA, an illegal take of a species occurs when the take of that species is the result of an action by a person or an agency.  16 U.S.C. § 1536(b)(3)(A); *see* Section III(C)(2)(iii).  In contrast, "[t]akes that result from acts of nature do not fall within the prohibition of § 9 and cannot be blamed on the Corps."  *Alabama*, 441 F. Supp. 2d at 1134 (referencing 16 U.S.C. § 1532(19)).  There is no illegal take if there is no "but for" relationship between the proposed agency action and the subsequent take.  *See* Section III(C)(2)(iii).  Here, rainfall and other precipitation cause the natural filling of the Lakes.  As the Lakes fill, the surrounding areas flood.  This flooding can cause take of listed species and their habitats.  However, this is not an illegal take under § 9 of the ESA because this flooding is the result of the natural filling of the Lakes and not the result of the artificial breaching.

## IV.  CONCLUSION

For the reasons set forth above, each  party's motion for summary judgment is granted in part and denied in part.  An appropriate order accompanies this memorandum.


Henry H. Kennedy, Jr.
United States District Judge

Dated: March 17, 2008